IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

TAMMY DENSMORE                                                    PLAINTIFF

V.                              CASE NO. 4:05-CV-770 (WRW)

PILGRIM'S PRIDE CORPORATION                          DEFENDANT

**BRIEF IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

### I.    Introduction

Plaintiff Tammy Densmore is a current employee of defendant Pilgrim's Pride

Corporation ("Pilgrim's Pride") at its poultry processing plant in Clinton, Arkansas.  She has

twice been terminated for violations of defendant's points-based attendance policy.[1]  In this

lawsuit, plaintiff claims that she was terminated in 2003 and 2004 based on two leaves that

were allegedly protected under the FMLA, and claims retaliation for exercising her FMLA

rights.  Furthermore, she claims that she was discharged in June 2004, as a result of gender

and pregnancy discrimination.  As a matter of law, plaintiff was not entitled to FMLA leave

for the absences at issue in this lawsuit and cannot establish a retaliation claim.  Furthermore,

the evidence does not substantiate her claim that her 2004 termination was motivated by gender

and pregnancy discrimination.  For the reasons set forth herein, Pilgrim's Pride is entitled to

judgment in its favor on all claims.

---

[1] The first termination was later converted to a suspension without pay.

## II.    Discussion of Relevant Facts

### A.    Background

Pilgrim's Pride operates a poultry processing plant in Clinton, Arkansas. The plant was originally owned and operated by ConAgra Poultry Company ("ConAgra"), which was acquired by Pilgrim's Pride effective November 23, 2003. Plaintiff's employment at the Clinton facility began in January 2002. She was hired into the Packing department, but then later moved to Evisceration, where she works in the "pool." (Ex. 1, Deposition of Tammy Densmore Weaver ("Plaintiff Dep.") at p. 29). Plaintiff testified that this position requires her to be familiar with all positions in that area and rotate among them. (*Id.* at pp. 29-30). During the relevant period, plaintiff's immediate supervisor was Tom Murphree. Mr. Murphree reported to Ed Shelley, who was the Shift Manager for the day shift. (*Id.* at p. 31-32).

### B.    Attendance Policy

The attendance policy in effect at the Clinton facility is a points-based system under which employees are assessed points for unexcused absences. (Ex. 9, Attendance Policy). The policy provides for discharge upon accrual of 12 points. (*Id.*) The attendance policy is a necessary part of plant operations because each job on the line must be staffed in order for the plant to operate. (Ex. 2, Deposition of Edward Shelley ("Shelley Dep.") at pp. 12-13).

Employees do not receive points for excused absences. Excused absences include absences for work-related injury, vacation, military leave, union business, and FMLA leave. (Ex. 9). Employees are assessed points for other types of absences. Generally, each one-day absence counts as one point. An absence of two hours or less counts as one-half a point. With

respect to non-FMLA medical leave, the policy provides that the employee receives only one point for the duration of the medical leave, so long as the absence is supported by documentation. Employees may also reverse or work off points through perfect attendance credits. Specifically, for each thirty days without an absence, a half-point is subtracted from the employee's point total. (*Id.*).

Each employee's points are tracked on a report that is maintained by the on-site nurse. (Ex. 11, Plaintiff's attendance report dated May 28, 2004; Ex. 12, Plaintiff's attendance report dated June 5, 2006; Ex. 2, Shelley Dep. at p. 17; Ex. 5, Deposition of Pam Duncan ("Duncan Dep.") at p. 6). When an employee receives enough points to receive a warning letter under the attendance policy, that warning is automatically generated by the computer system. (Ex. 5, Duncan Dep. at p. 7). Written warnings are given at six points and nine points. (Ex. 9). When an employee reaches 12 points, a notification of termination is automatically generated and delivered by the nurse to the employee's supervisor. (Ex. 5, Duncan Dep. at p. 7; Ex. 6, Deposition of Connie Kirkendoll ("Kirkendoll Dep.") at pp. 7-9). The employee is then terminated. (Ex. 5, Duncan Dep. at pp. 7-9; Ex. 6, Kirkendoll Dep. at p. 7).

The attendance policy has been in effect during the entire period of plaintiff's employment at the Clinton facility. (Ex. 1, Plaintiff Dep. at p. 34). The policy was presented to plaintiff when she was hired, and she signed a written acknowledgment of receipt of the policy. (*Id.* at p. 33-34; Ex. 10, acknowledgment of receipt of attendance policy).

## C.    Reinstatement Policy

During the relevant period, the Shift Manager—Ed Shelley for the purposes of this case—generally had the authority to reinstate an employee who had been terminated under the

attendance policy if the employee requested reinstatement.[2] (Ex. 2, Shelley Dep. at pp. 13-

15). The reinstated employee would generally be brought back to work with eleven points.

Reinstatement was considered the employee's "last chance" at correcting his or her attendance

problems. (*Id.* at p. 14; Ex. 7, Deposition of Roger Hooper ("Hooper Dep.") at p. 27).

Shelley never denied a request for reinstatement. (Ex. 2, Shelley Dep. at pp. 14-15). Shelley

never reinstated an employee who had already been reinstated once. (Ex. 2, Shelley Dep. at p.

26; Ex. 8, Affidavit of Derek Fletcher ("Fletcher Aff.") at ¶ 6).

### D.    Plaintiff's May 2003 Termination

On or about May 20, 2003, plaintiff was terminated for excessive absenteeism pursuant

to the attendance policy. Over approximately a year and half of employment, plaintiff

accumulated points for a variety of reasons including her own illness, her son's illness,

tardiness, transportation, and the weather. (Ex. 11). Shelley granted plaintiff two personal

leaves of absence in June and August 2002 for absences related to her son having tubes put in

his ears. (Ex. 1, Plaintiff Dep. at pp. 41-43; Ex. 11). Plaintiff did not qualify for FMLA

leave at that time because she had not worked for the company for 12 months. (Ex. 1,

Plaintiff Dep. at p. 42). Because plaintiff was granted a personal leave of absence, she only

received one point for the duration of each leave related to her son's medical condition. (Ex.

1, Plaintiff Dep. at pp. 42-43; Ex. 11). In February and March 2003, plaintiff took FMLA

leaves that were related to her son's health condition. (Ex. 1, Plaintiff Dep. at p. 41). She

was not assessed any points for those absences. (Ex. 11).

---

[2] About six months ago, the Plant Manager, Roger Hooper, assumed authority over reinstatement decisions. (Ex. 7, Hooper Dep. at pp. 6-7). Since April 1, 2006, Hooper's policy is not to grant reinstatements. (*Id.* at p. 26).

Plaintiff testified that if she was going to be absent, she would report that to Pam Duncan, the on-site nurse, or Murphree. (*Id*. at p. 37). Plaintiff reached 11.5 points in August 2002, but she worked her points total back down to 10 points in November 2002 by earning perfect attendance credits. (Ex. 11). Plaintiff received written warnings under the attendance policy on March 27, 2002; May 23, 2002; and July 1, 2002. (Ex. 13, warnings regarding attendance). Plaintiff does not dispute any of the points that were assigned to her prior to the May 16, 2003, absence that led to her termination. (Ex. 1, Plaintiff Dep. at p. 43).

Plaintiff received her twelfth and final point for a May 14-16, 2003, medical absence that was related to a hand contusion. Plaintiff testified that a window fell on her hand while she was at home, and that the swelling in her hand made it impossible for her to wear the wire glove that she is required to wear in her job. (*Id*. at pp. 43-46). Plaintiff testified that on May 14, 2003, Duncan sent her home. (*Id*. at pp. 43-44). Plaintiff did not return to work until May 19, 2003. (*Id*. at p. 47; Ex. 14, punch detail reflecting plaintiff's hours worked).

Plaintiff went to see Dr. Harry Starnes on May 15, 2003, and had x-rays taken. (*Id*. at pp. 47-48). Plaintiff testified that Dr. Starnes advised her that she had not broken any bones in her hand and told her to treat it with ice and ibuprofen. (*Id*.) She did not have any follow-up appointments with Dr. Starnes. Plaintiff did not see any other physician or receive any other treatment regarding the hand contusion. (*Id*. at p. 48).

When plaintiff returned to work on May 19, 2003, she submitted an FMLA certification form that had been provided by Dr. Starnes' office. (*Id*. at pp. 48-49; Ex. 15). That form indicated that plaintiff had a "contusion, hand" with a duration of "5/14/03 –

5-18-03 return to work 5-19-03." (Ex. 15, FMLA certification form). In response to the question "If a regimen of continuing treatment by the patient is required under your supervision, provide a general description of such regimen (e.g. prescription drugs, physical therapy requiring special equipment)," the form stated only "ibuprofen." (*Id.*) On the form, plaintiff was certified as having a "serious health condition" under category 6 of the definition sheet provided with the certification form. (Ex. 15). Category 6 is defined as:

> Any period of absence to receive multiple treatments (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, either for restorative surgery after an accident or other injury, or for a condition that would likely result in a period of incapacity of more than three consecutive calendar days in the absence of medical intervention of treatment, such as cancer (chemotherapy, radiation, etc.) severe arthritis (physical therapy), kidney disease (dialysis).

(Ex. 16, "serious health condition" definitions sheet).

Plaintiff's treating physician, Dr. Starnes, testified that the form was completed and signed by his nurse practitioner, and that he does not believe that any of the six categories of "serious health condition" was satisfied in plaintiff's case. (Ex. 4, Deposition of Dr. Harry Starnes ("Dr. Starnes Dep.") at pp. 11, 13-16, 27). Dr. Starnes testified that plaintiff had a bruised and swollen hand, with a decreased range of motion, and that her x-ray revealed no broken bones. (*Id.* at pp. 7, 10). He further testified that the fact that no pain medicine was prescribed was consistent with mild or moderate pain. (*Id.* at p. 9).

Upon receiving the certification form, Pam Duncan—the on-site nurse—faxed it to David Davis, Safety Manager for the Clinton and Batesville facilities. (Ex. 5, Duncan Dep. at p. 12). At that time, Davis was the decision-maker with respect to FMLA leaves about which Duncan had any question. (Ex. 3, Deposition of David Davis ("Davis Dep.") at p. 8; Ex. 5,

Duncan Dep. at p. 12).  Although Davis does not specifically recall reviewing plaintiff's

certification form, he testified that he would have denied the request because there were no

follow-up appointments and the only treatment was ibuprofen.  (Ex. 3, Davis Dep. at pp. 10-

12).  Duncan told plaintiff that her request for FMLA leave had been denied because she did

not have a serious health condition.  (Ex. 1, Plaintiff Dep. at p. 51).

Because the three-day absence related to plaintiff's hand contusion did not fall under the

FMLA, she received one point for that absence.[3]  (Ex. 1, Plaintiff Dep. at p. 55).  This

brought plaintiff's point total up to 12 points, and she was discharged.  Plaintiff did not ask

Shelley to reinstate her, but even if she had, he believed he had no authority to do so in this

circumstance because Davis had already determined that the absence did not qualify under the

FMLA, and Shelley did not believe he had any authority to override Davis's decision.  (Ex. 2,

Shelley Dep. at pp. 19-20, 32-33).

### D.    Plaintiff's Grievance and Reinstatement

Plaintiff filed a grievance relating to her termination, which was pursued by the union

on her behalf.  (Ex. 1, Plaintiff Dep. at pp. 52-53).  At Step 4 of the grievance procedure, a

panel made up of union and company representatives agreed to reinstate plaintiff with 11 points

under the attendance policy.  (Ex. 8, Fletcher Aff. at ¶ 2 and Ex. A).  The termination was

recharacterized as a suspension without pay.  Pursuant to that decision, plaintiff signed a return

to work agreement that stated:

> You were terminated on May 20, 2003, for accumulating 12 points under the
> Company's Attendance Policy.  Excessive absenteeism cannot and will not be

---

[3] Although it is not addressed in the written attendance policy, if the Pilgrim's Pride nurse directs an
employee to leave work for medical reasons, the employee does not receive a point for that day's
absence.  If the employee is absent the following day for the same or a different medical reason, he or
she receives a point for that absence, unless it is FMLA leave.  (Ex. 8, Fletcher Aff. at ¶ 5).

tolerated. . . . ConAgra Poultry Company has agreed to replace the termination on points for attendance with a suspension. You will be reinstated with 11 points effective October 13, 2003.

(Ex. 17, Plaintiff's return to work agreement). Plaintiff understood that she was being reinstated with 11 points and that she would not receive back pay. (Ex. 1, Plaintiff Dep. at pp. 56-58). She testified that she received a $300 bonus that had been paid during the period of her suspension. (*Id.* at pp. 56-57). Plaintiff returned to work on October 13, 2003. (*Id.* at p. 61).

### E.    June 2004 Termination

Plaintiff was again terminated for violating the attendance policy on or about June 1, 2004. (Ex. 18). She does not dispute any of the points assigned to her after her reinstatement except for the final point that resulted in her termination. (Ex. 1, Plaintiff Dep. at p. 62). Plaintiff testified that sometime in February 2004, she advised Duncan, Shelley, and Connie Kirkendoll, Human Resources Supervisor, that she was pregnant. (*Id.* at pp. 63-64, 69). Plaintiff spoke with Duncan and Kirkendoll about whether she qualified for FMLA leave. (*Id.* at pp. 66-67). Plaintiff testified that they told her that she had not worked enough hours in the previous 12 months to qualify for FMLA leave. (*Id.* at pp. 67, 69). Plaintiff said she had Kirkendoll check her hours on several occasions to see if she was eligible, but her hours always fell under 1250. (*Id.* at pp. 69-70).

Plaintiff had some absences related to her pregnancy for which she was not assigned any points. For example, on two occasions, although plaintiff was supposed to work overtime, Shelley excused her so that she could go to a doctor's appointment that had been scheduled for after the regular shift ended. (*Id.* at pp. 62-63; Ex. 11). Plaintiff testified that on another

occasion Duncan told her to go home after she passed out at work, and she did not receive a point. (Ex. 1, Plaintiff Dep. at p. 65). Following her reinstatement, plaintiff received points for absences not related to her pregnancy for being tardy, out of town and sick, but she also worked off some points by earning attendance credits. (Ex. 11).

On May 27, 2004, plaintiff reported to Duncan that she was having labor pains or abdominal cramps.[4] (Ex. 1, Plaintiff Dep. at pp. 70-71). Duncan told plaintiff to call her doctor, which she did. Plaintiff's doctor told her that she should leave work and come into his office. Plaintiff testified that Duncan, Hooper and Shelley then told her to leave work. (*Id.* at p. 71). Plaintiff went to see her doctor and was taken off of work until May 31, 2004. (*Id.* at p. 72). On May 28, 2004, plaintiff's husband (who also works at the Clinton facility) brought in her doctor's note. (*Id.* at p. 74). On May 27, 2004, plaintiff had only worked 1043.52 hours during the immediately preceding 12-month period and so was not eligible for FMLA leave. (*Id.* at p. 79; Ex. 8, Fletcher Aff. at ¶3 and Ex. B). Although plaintiff would not have received a point if she had only been absent the day that the nurse sent her home, she also missed the following day. (*Id.* at pp. 75-76). Therefore, she received one point for a non-FMLA medical absence. Plaintiff understood that if she received a point for the absence she would "point out." (*Id.* at p. 73).

When plaintiff returned to work on June 1, 2004, Shelley told her that she was being terminated for "pointing out" and provided her with written notice of her termination. (Id. at pp. 73-74; Ex. 2, Shelley Dep. at p. 24; Ex. 18). Plaintiff did not ask Shelley to reinstate her, but even if she had, he would have had no authority to do so because she was already working

---

[4] Plaintiff's son was not born until August 5, 2004. (Ex. 1, Plaintiff Dep. at p. 10).

under the return to work agreement. (Ex. 2, Shelley Dep. at p. 26). No employee has been reinstated twice during the same period of employment. (Ex. 8, Fletcher Aff. at ¶ 6).

Plaintiff filed a grievance relating to her second termination, but it was withdrawn by the union because she had already been reinstated once with 11 points. (Ex. 1, Plaintiff Dep. at pp. at 76-77; Ex. 19, grievance related to June 1, 2004, termination).

### F.     EEOC Charge and Lawsuit

Plaintiff filed a charge of discrimination with the EEOC on October 22, 2004, alleging that her June 1, 2004, termination was the result of gender and pregnancy discrimination. (Ex. 20, EEOC charge). The EEOC issued a dismissal and notice of right to sue on March 24, 2005. (Ex. 21, EEOC Dismissal and Notice of Rights). This lawsuit was instituted on May 19, 2005.

### G.     Plaintiff's December 2005 Re-Hire

In August 2005, plaintiff submitted an application for re-hire to the Clinton facility. (Ex. 1, Plaintiff Dep. at p. 26). Persons who have been terminated for violating the attendance policy are generally eligible for re-hire after 90 days.[5] (Ex. 8, Fletcher Aff. at ¶ 8). Pilgrim's Pride attempted to reach plaintiff in October 2005 regarding her application, but she had moved. (Ex. 1, Plaintiff Dep. at p. 27). When plaintiff returned to Clinton in November 2005, she contacted Pilgrim's Pride. (*Id*. at pp. 27-28). Plaintiff was re-hired effective December 1, 2005. (*Id*. at p. 28). Because she was a re-hire, plaintiff started with zero points under the attendance policy. As of June 5, 2006, plaintiff had 11.5 points. (Ex. 12).

---

[5] On rare occasions, an individual may be re-hired before the 90-day period expires if the plant is having difficulty filling a particular position such as the live hanger position, which involves handling and killing live birds. (Ex. 8, Fletcher Aff. at ¶ 8).

### III.    Argument

**A.    Summary Judgment Standard**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). If plaintiff fails to establish the existence of an essential element in her cause of action for which she bears the burden of proof at trial, summary judgment is proper. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Summary judgment motions "may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990). "There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

Finally, the Supreme Court held that once a party has carried its burden under Rule 56, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Green v. St. Louis Housing Authority*, 911 F.2d 65, 68 (8th Cir. 1990); Fed. R. Civ. P. 56(e) (party adverse to summary judgment motion must respond with specific facts showing that genuine factual issue exists). The Eighth Circuit Court of Appeals has

routinely recognized that summary judgment is appropriate in employment discrimination cases. *See, e.g., Dorsey v. Pinnacle Automation Co.*, 278 F.3d 830 (8th Cir. 2002); *Rose-Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1109 (8th Cir. 1998).

**B.    FMLA Claims**

  1.    *Interference Claim*

    a.    <u>May 2003 Termination</u>

  Plaintiff alleges that her May 2003 termination was based on a leave that was protected by the FMLA. (Complaint at ¶ 7). Plaintiff refers to the point she received for her absence related to her hand contusion, which brought her up to twelve points. As a matter of law, the assignment of a point for that absence and plaintiff's subsequent termination did not interfere with any rights protected by the FMLA because plaintiff's hand contusion was not a "serious health condition."

  The FMLA allows an "eligible employee" to take up to twelve weeks of leave during any twelve-month period for certain family or medical reasons including "a serious health condition that makes the employee unable to perform the functions of the position of such employee." *Reynolds v. Phillips & Temro Industries, Inc.*, 195 F.3d 411, 413 (8th Cir. 1999) (citing 29 U.S.C. § 2612(a)(1)(D)). An "eligible employee" is defined as "one who has been 'employed for at least 12 months by the employer' and provided 'at least 1250 hours of service during the previous 12-month period.'" *Sepe v. McDonnell Douglas Corp.*, 176 F.3d 1113, 1115 (8th Cir. 1999) (quoting 29 U.S.C. § 2611(2)(A)(i)-(ii)).

  It is undisputed that plaintiff was an "eligible employee" within the meaning of the statute when she applied for FMLA leave in May 2003. That is, she had worked for Pilgrim's

Pride's predecessor ConAgra for more than twelve months and had worked over 1250 hours in the immediately preceding 12-month period. It is also clear, however, that she did not have a "serious health condition" that would have qualified her for an FMLA absence. In pertinent part, the FMLA regulations provide the following definition of "serious health condition":

> (a) For purposes of FMLA, "serious health condition" entitling an employee to FMLA leave means an illness, injury, impairment, or physical or mental condition that involves:
>
> . . .
>
>> (2) Continuing treatment by a health care provider. A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:
>>
>>> (i) A period of incapacity (i.e., inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>>>
>>>> (A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or
>>>>
>>>> (B) Treatment by a health care provider on at least one occasion which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.114.

Therefore, to meet the requirements of a serious health condition, plaintiff was required to prove (1) that she had a "period of incapacity requiring absence from work," (2) that this period of incapacity exceeded three days, and (3) that she received "continuing treatment by . . . a health care provider" within the period. *Thorson v Gemini, Inc.*, 205 F.3d 370, 377 (8th

Cir. 2000). Plaintiff testified that her hand was swollen "for about four days," (Ex. 1,

Plaintiff Dep. at p. 47), and she was taken off work for more than three consecutive calendar

days. (Ex. 15). However, plaintiff only had one visit to a health care provider, and there was

no regimen of continuing treatment. (Ex. 4, Dr. Starnes Dep. at pp. 9-15). The regulations

specifically provide that "[a] regimen of continuing treatment that includes the taking of over-

the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids,

exercise and other similar activities that can be initiated without a visit to a health care

provider, is not, by itself, sufficient to constitute a regimen of continuing treatment for the

purposes of FMLA leave." 29 C.F.R. § 825.114(b). Thus, plaintiff's prescribed treatment of

ibuprofen and ice did not amount to "continuing treatment." Because plaintiff cannot prove

that she received "continuing treatment" for the hand contusion, the injury does not constitute

a "serious health condition" as a matter of law.

Indeed, plaintiff's own treating physician testified that she did not have a serious health

condition. (Ex. 4, Dr. Starnes Dep. at p. 27). Although plaintiff submitted a completed

certification form, that form was invalid on its face. The nurse practitioner who completed the

form certified plaintiff as having a serious health condition under the category of multiple

treatments, which applies to absences for treatments such as chemotherapy and dialysis.

Plaintiff's bruised and swollen hand plainly did not fall within that prong of the serious health

condition definition, or any other prong as she had one visit with a physician and no regimen

of continuing treatment. As the Eighth Circuit has noted,

> In enacting the FMLA Congress did not intend to cover leave for "short-term
> conditions for which treatment and recovery are very brief." . . . Examples of
> conditions which would ordinarily not be covered include "the common cold,

the flu, ear aches, upset stomach, minor ulcers, [and] headaches other than *migraine.*"

*Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal citations omitted).

While Pilgrim's Pride could have requested that plaintiff provide a second opinion when she turned in a facially invalid certification form, *see* 29 U.S.C. § 2613(c)(1), it was not required to do so. *See Stekloff v. St. John's Mercy Health Systems*, 218 F.3d 858 (8th Cir. 2000) ("We do not read § 2613(c)(1) as requiring an employer to obtain a second opinion or else waive any future opportunity to contest the validity of the certification."). In other words, the fact that plaintiff submitted a physician's certification in support of her request for FMLA leave does not excuse her from having to prove that she in fact had a serious health condition entitling her to the protections of the FMLA. The undisputed material facts—including plaintiff's and her treating physician's testimony—establish that she did not have a serious health condition in May 2003, and the FMLA offers no protection for an absence that was not due to a serious health condition. *Woods,* 409 F.3d at 990 ("Only absences 'attributable to . . . serious health conditions' are protected.") (quoting *Spangler v. Federal Home Loan Bank of Des Moines*, 278 F.3d 847, 853 (8th Cir. 2002)). Because plaintiff's absence related to the hand contusion was not due to a serious health condition, Pilgrim's Pride is entitled to judgment in its favor as a matter of law on the FMLA interference claim relating to the May 2003 termination.

b.    June 2004 Termination

Plaintiff also contends that her second termination interfered with rights protected by the FMLA. (Complaint at ¶ 11). The final absence that precipitated plaintiff's second

termination was related to her pregnancy, which is a serious health condition under the FMLA. 29 C.F.R. § 825.114(a)(2)(ii). However, at that time plaintiff was not an "eligible employee" as defined by the FMLA. That is, on May 27, 2004, she had not worked the required 1250 hours in the previous 12-month period necessary to make her eligible for FMLA leave. *See* 29 U.S.C. § 2611(2)(A)(i)-(ii). Specifically, from May 27, 2003 to May 27, 2004, plaintiff had provided only 1043.52 hours of service. Plaintiff testified that she has no basis for disputing this. (Ex. 1, Plaintiff Dep. at p. 79).

Nor does the fact that plaintiff was ultimately returned to work pursuant to her grievance have any bearing on the calculation of her "hours of service." First, although plaintiff was returned to work pursuant to her grievance, she was not awarded any compensation for the period during which she was off work, other than a small bonus. Furthermore, even if plaintiff had been awarded back pay, that would not count as service hours for the purpose of determining her FMLA eligibility. *Plumley v. Southern Container, Inc.*, 303 F.3d 364, 372 (1st Cir. 2002) (holding that "hours of service" within the meaning of the FMLA includes only those hours "actually worked in the service and at the gain of the employer" and not work-hours lost during the successful pursuit of a grievance).

As such, Pilgrim's Pride is also entitled to summary judgment on the interference claim relating to plaintiff's 2004 termination. *Sepe*, 176 F.3d at 1115 (affirming summary judgment because plaintiff alleging violation of FMLA rights had not worked enough hours to qualify as an "eligible employee").

2.    *Retaliation Claim*

Plaintiff also alleges that Pilgrim's Pride retaliated against her for exercising her rights under the FMLA. (Complaint at ¶ 21). Plaintiff's retaliation theory is that individuals who did not request FMLA leave have been allowed to remain working after exceeding 12 points. (*Id.*). The FMLA retaliation claim is not supported by any evidence, and Pilgrim's Pride is entitled to summary judgment in its favor.

Plaintiff admits that no one from Pilgrim's Pride ever said anything disparaging to her about the fact that she made any request for FMLA leave. (Ex. 1, Plaintiff Dep. at p. 97). As plaintiff has offered no direct evidence of retaliatory intent, her claim must be analyzed under the *McDonnell Douglas* burden-shifting framework. First, plaintiff must establish a prima facie case of retaliatory discrimination by showing that "she exercised rights afforded by the Act, that she suffered an adverse employment action, and that there was a causal connection between her exercise of rights and the adverse employment action." *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827, 832 (8th Cir. 2002). If plaintiff establishes a prima facie case, the burden shifts to Pilgrim's Pride to articulate a legitimate, non-discriminatory reason for its actions. *Id.* at 833. If it does, the burden shifts back to plaintiff to demonstrate that Pilgrim's Pride's proffered reason is pretextual. *Id.* In addition to creating an issue of fact as to pretext, the evidence must support the reasonable inference that Pilgrim's Pride acted in retaliation. *Id.*

a.    <u>Plaintiff cannot make a prima facie case of retaliation</u>

The FMLA prohibits discrimination against an employee based on her use of FMLA leave. *Smith*, 302 F.3d at 832. Plaintiff last exercised her rights by using FMLA leave on March 13, 2003. (Ex. 11). Plaintiff's theory, however, seems to be that Pilgrim's Pride

discriminated against her for *requesting* FMLA leave. Neither plaintiff's request for FMLA leave related to her hand contusion nor the inquiry related to her pregnancy was a statutorily protected activity that would support a retaliation claim.

Plaintiff did not exercise any rights under the FMLA in 2004 when she inquired about FMLA leave for her pregnancy. The FMLA does not protect a request for medical leave made by an employee who is not eligible for FMLA leave. *See Walker v. Elmore County Bd. of Education*, 379 F.3d 1249, 1253 (11th Cir. 2004) (holding that request for maternity leave made by employee who had not worked the requisite 1250 hours was not protected by the FMLA). Thus, plaintiff can have no retaliation claim based on her request for FMLA leave in 2004 because she was not an "eligible employee" under the FMLA.

Nor does plaintiff state a viable claim for retaliation to the extent that she contends her May 2003 termination was in retaliation for requesting FMLA leave based on the hand contusion. A request for FMLA leave by an employee who does not have a serious health condition is not a protected activity as such an employee has no "rights" to be exercised under the statute. *Schnoor v. Publications Int'l, Ltd.*, 2005 WL 1651045 at *7 (N.D. Ill. July 7, 2005) (following *Walker* and holding that employee who had exhausted her 12 weeks of FMLA leave at time request for additional leave was made could not bring retaliation claim); *see also Walker*, 379 F.3d at 1253 ("[T]he statute does not does not protect an attempt to exercise a right that is not provided by the FMLA . . ."). Therefore, plaintiff cannot meet the first element of a prima facie case of retaliation with respect to either of her terminations.

However, even if plaintiff's mere invoking of the FMLA were a statutorily protected activity, she cannot otherwise establish a prima facie case of retaliation because there is

absolutely no evidence of any causal connection between her use of or request for FMLA leave and her terminations. Again, plaintiff has not taken FMLA leave since being absent to take her son to the doctor on March 13, 2003—two months before her first termination and fourteen months before her second termination. More than a temporal connection between protected activity and the action complained of is generally required to present a fact issue on retaliation. *Cheshewalla v. Rand & Son Constr. Co.*, 415 F.3d 847, 852 (8th Cir. 2005). Here, plaintiff has no evidence of any causal link between her terminations and her use of FMLA leave, and the timing of plaintiff's discharges run counter to any reasonable inference that either of her terminations was in retaliation for her use of FMLA leave. *Wallace v. Sparks Health System*, 415 F.3d 853, 859 (8th Cir. 2005) ("The cases that have accepted temporal proximity alone as sufficient to create an inference of a causal link have uniformly held that the temporal proximity must be 'very close.'") (citing cases finding three-month and fourth-month periods between protected activity and adverse employment action were insufficient to satisfy causation element); *Cheshewalla*, 415 F.3d at 852 (one-month period standing alone is insufficient).

Nor is there any causal connection between plaintiff's facially invalid request for FMLA leave in May 2003 and her first termination—except that the legitimate denial of that request resulted in plaintiff reaching twelve points.[6] Similarly, plaintiff's second termination in June 2004 was due to a non-FMLA medical absence that caused plaintiff to exceed the permissible number of points under the attendance policy.[7] Plaintiff herself testified that she does not believe that the fact that she was assessed a point for her absence in May 2004 had

---

[6] Plaintiff does not dispute the validity of her points leading up to the final one. (Ex. 1, Plaintiff Dep. at p. 43).

[7] Again, plaintiff does not dispute any points assigned to her after her reinstatement, except for the final one. (Ex. 1, Plaintiff Dep. at p. 62).

anything to do with the fact that she had requested FMLA leave. (Ex. 1, Plaintiff Dep. at p. 95). In sum, the undisputed evidence establishes that plaintiff was terminated because she accrued too many points under the attendance policy, not because she asked for FMLA leave.

   b. <u>Plaintiff cannot establish that Pilgrim's Pride's stated reason for terminating her was pretext for retaliation.</u>

  Even if plaintiff could make a prima facie case for retaliation, Pilgrim's Pride is entitled to summary judgment because it has articulated a legitimate, non-discriminatory explanation for her terminations, and there is no evidence of pretext. Furthermore, the facts do not support a reasonable inference that her terminations were motivated by retaliation for exercising any "rights" under the FMLA. Plaintiff was terminated because the attendance policy provides that an employee who accrues twelve points is to be discharged. Violation of an attendance policy is a legitimate, non-discriminatory reason for discharging an employee. *Price v. S-B Power Tool*, 75 F.3d 362, 366-267 (8th Cir. 1996).

  Furthermore, the evidence establishes that no exceptions are made to the twelve-point discharge rule, except that during the relevant period, employees who asked to be reinstated after "pointing out" were allowed to return to work as a last chance to correct attendance problems. To the extent that plaintiff claims that in 2003 she was not reinstated immediately in retaliation for requesting FMLA leave, the undisputed facts establish that plaintiff is not similarly situated to those employees who were reinstated by Shelley. Instances of disparate treatment by the employer can support a claim of pretext but only if plaintiff establishes that she and the more favorably treated employees outside her protected class were "similarly situated in all relevant respects." *See Johnson v. Baptist Medical Center*, 97 F.3d 1070, 1073 (8th Cir. 1996). The test for whether other employees are similarly situated to a plaintiff such

that comparison is warranted is a "rigorous" one. *Palesch v. Missouri Com'n on Human Rights*, 233 F.3d 560, 568 (8th Cir. 2000).

First, in October 2003, plaintiff *was reinstated* with 11 points at Step 4 of the grievance process. So, her complaint is only that she was not reinstated immediately by Shelley. Second, plaintiff did not ask Shelley to be reinstated. Third, unlike other employees who were immediately reinstated by Shelley, plaintiff had made a facially invalid request for FMLA leave for her final absence that led to her termination in May 2003. That request had been denied by Davis, not Shelley. Davis was the Safety Manager and the decision maker with respect to FMLA leaves about which Duncan had any question. As such, Shelley believed he had no authority to override that decision by reinstating her. Therefore, plaintiff has not raised any issue of fact regarding pretext with respect to her first termination.

To the extent that plaintiff claims her second termination on June 1, 2004, was retaliatory, she again cannot establish pretext by comparing herself to employees who were reinstated immediately after being terminated for violating the attendance policy. Even if plaintiff had asked Shelley to reinstate her when he notified her of her second termination— which she did not—he could not have done so because she was already working under a return to work, or "last chance," agreement. Shelley testified that he never reinstated an employee who had already been given their last chance to correct attendance problems. (Ex. 2, Shelley Dep. at p. 26).

There is simply no evidence that would support a reasonable inference that either of plaintiff's terminations was in retaliation for her request for FMLA leave. The evidence

establishes that plaintiff was terminated for violating the attendance policy, and not in retaliation for invoking the FMLA.

### C.    Gender and Pregnancy Discrimination Claims

    1.    *Any claim related to plaintiff's May 2003 termination is barred by the failure to file an EEOC charge relating to that decision.*

Plaintiff also claims that she was terminated based on gender and pregnancy discrimination in violation of Title VII, the Pregnancy Discrimination Act, and the Arkansas Civil Rights Act ("ACRA"). Any such claim with respect to plaintiff's first termination is barred by her failure to exhaust her administrative remedies or is time-barred. An individual suing under Title VII or the Pregnancy Discrimination Act must file a charge of discrimination with the EEOC within 180 days of the adverse employment action. Plaintiff's first termination was on May 20, 2003, and she was reinstated pursuant to her grievance on October 13, 2003. She did not file a charge of discrimination with the EEOC until October 22, 2004. (Ex. 20). Plaintiff thus failed to exhaust her administrative remedies with respect to that claim. *Williams v. Little Rock Municipal Water Works*, 21 F.3d 218, 222 (8th Cir. 1994) ("Exhaustion of administrative remedies is central to Title VII's statutory scheme because it provides the EEOC the first opportunity to investigate discriminatory practices and enables it to perform its roles of obtaining voluntary compliance and promoting conciliatory efforts.").

Furthermore, under the ACRA, a complaint must be filed within one year of the alleged discrimination or within 90 days of receipt of the right to sue notice, whichever is later. Ark. Code Ann. § 16-123-107(c)(3). Because plaintiff did not file an EEOC charge relating to her May 2003 termination, any ACRA claim had to be filed within one year of her

termination. As such, plaintiff is not entitled to pursue any gender or pregnancy discrimination claim relating to her May 2003 termination.[8]

> 2. *There is no issue of material fact with respect to the claim that plaintiff's June 2004 termination was motivated by gender or pregnancy discrimination.*

As with the FMLA retaliation theory, plaintiff has produced no direct evidence that gender or pregnancy motivated her second termination, so the *McDonnell Douglas* analysis applies. Plaintiff must first establish a prima facie case of discrimination by showing that: (1) she is a member of a protected class, (2) she was qualified to perform her job, (3) she suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination.[9] *See Williams v. Ford Motor Co.*, 14 F.3d 1305, 1308 (8th Cir. 1994).

Plaintiff cannot satisfy the fourth element of the prima facie case because she has not come forward with any evidence that her termination occurred under circumstances giving rise to an inference of unlawful discrimination on the basis of gender or pregnancy. Furthermore, even if plaintiff could make a prima facie case, Pilgrim's Pride has produced a legitimate, non-discriminatory reason for terminating plaintiff; therefore, "any presumption of discrimination drops out of the picture." *See Evers v. Alliant Techsystems, Inc.*, 241 F.3d 948, 958 (8th Cir.

---

[8] Even if any gender or pregnancy claims relating to plaintiff's first termination were not otherwise barred, she has no pregnancy claim relating to that termination because she was not pregnant.

[9] The ACRA prohibits discrimination on the basis of gender. Ark. Code Ann. § 16-123-107(a). The gender claim under the ACRA is analyzed under the same burden-shifting framework as the Title VII claim. *See Maxfield v. Cintas Corp. No. 2*, 427 F.3d 544, 550 (8th Cir. 2005); *see also* Ark. Code Ann. § 16-123-105(c) ("When construing this section, a court may look for guidance to state and federal decisions interpreting the federal Civil Rights Act of 1871, as amended and codified in 42 U.S.C. § 1983, as in effect on January 1, 1993, which decisions and act shall have persuasive authority only.").

2001).  Plaintiff must provide specific evidence that Pilgrim's Pride's reason for terminating her was a false one, and that her gender or pregnancy was in fact a motivating factor.  *See id.* (plaintiff must present affirmative evidence rather than simply contend that a jury might disbelieve the defendant's evidence).

Again, plaintiff was automatically terminated effective June 1, 2004, because she accrued twelve points in violation of the attendance policy.  The burden therefore shifts back to plaintiff who must demonstrate that Pilgrim's Pride's stated reasons for its actions were false *and* that intentional gender or pregnancy discrimination was the true reason for its actions.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146-47 (2000) (stating that it is not enough to disbelieve the employer; rather, the factfinder must believe the plaintiff's explanation of intentional discrimination) (*citing St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 519 (1993)).

There is no complaint here that Pilgrim's Pride administers its attendance policy and the assignment of points differently based on an employee's gender or pregnancy.  Plaintiff does not dispute any of the points assigned to her absences following her reinstatement other than the final point that resulted in her discharge, and she does not believe the fact that she received a point for her final absence in May 2004 had anything to do with the fact that she was pregnant or that she was a woman.  (Ex. 1, Plaintiff Dep. at pp. 62, 95).  Furthermore, no one from Pilgrim's Pride ever said anything disparaging to plaintiff about her gender or her pregnancy.  (*Id.* at pp. 96-97).  Plaintiff testified that the only difference between treatment of men and women at Pilgrim's Pride is that "they rehire the guys back after they point them out

and then somebody that's pregnant, they fire them."[10]  (*Id.* at p. 96).  So, plaintiff's

gender/pregnancy claim is that she was not reinstated in June 2004 after she accrued 12 points.

However, plaintiff was not eligible for reinstatement because she was already under a last

chance agreement.  Men and non-pregnant women were treated no differently in this regard.

Further, it is undisputed that women were reinstated by Shelley after being terminated for

accruing 12 points in violation of the attendance policy.  (Ex. 2, Shelley Dep. at p. 27).  This

defeats any inference that reinstatements were available only to men or that the failure to

reinstate plaintiff in June 2004 was motivated by gender discrimination.

Nor does the evidence support the claim that the failure to reinstate plaintiff in June

2004 was motivated by her pregnancy.  Plaintiff admits that no one ever said anything

disparaging about her pregnancy, and she was afforded excused absences related to her

pregnancy.  (Ex. 1, Plaintiff Dep. at pp. 96-97; Ex. 11).  Most importantly, plaintiff cannot

satisfy the "rigorous" test for whether comparison to reinstated employees is warranted.

*Palesch v. Missouri Com'n on Human Rights*, 233 F.3d 560, 568 (8th Cir. 2000).  First,

plaintiff did not ask Shelley to reinstate her.  (Ex. 2, Shelley Dep. at p. 26).  Even more

importantly, she had already been reinstated once under a return to work agreement.  She had

been given her "last chance" and could not be given another one.  That is precisely why the

union did not pursue her grievance relating to the second termination.  There is no evidence

that any non-pregnant employee has been reinstated twice during the same period of

---

[10] Although plaintiff characterized this as "rehiring," the evidence establishes that the employees were actually reinstated, generally with 11 points, just as plaintiff was in October 2003.  A rehire, on the other hand, would result in an employee starting over with zero points.  Again, persons who have been terminated for violating the attendance policy are generally eligible for re-hire after 90 days.  (Ex. 8, Fletcher Aff. at ¶8).

employment. In other words, there is no evidence that any employee has been given two last chances—which is what plaintiff apparently believes she was entitled to.

While plaintiff may disagree with that decision, the Eighth Circuit Court of Appeals has consistently stated that the correctness or wisdom of the reasons given for a decision is irrelevant and that courts should look only to whether the stated reasons were the true reasons relied upon by the employer and not a pretext for discrimination. *Wilking v. County of Ramsey*, 153 F.3d 869, 874 (8th Cir. 1998). The relevant inquiry is not whether plaintiff's discharge was "reasonable," but only whether plaintiff has created a genuine issue of material fact as to whether his discharge was based on gender or pregnancy. *Id.*, 153 F.3d at 873 ("[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.") (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997)). The reasoning behind this policy is clear - the courts do not sit as a "super personnel department" in order to reexamine an employer's personnel decisions. *See Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968 (8th Cir. 1994).

Although plaintiff may believe that Pilgrim's Pride should have given her a second last chance, the law did not require it to do so.

## IV.    Conclusion

For the foregoing reasons, Pilgrim's Pride is entitled to judgment as a matter of law on all claims.

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201-3699
(501) 371-0808
FAX: (501) 376-9442
E-MAIL: mkaemmerling@wlj.com


By: _Michelle Kaemmerling_
    Bettina E. Brownstein (85019)
    Michelle M. Kaemmerling (2001227)
    Attorneys for Defendant


## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2006, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to the following:

**Luther Oneal Sutter - jwatson@aristotle.net**


And mailed the document and a copy of the Notice of Electronic Filing (NEF) by United States Postal Service to the following non-CM/ECF participants:


**Lucien Gillham**
**HARRILL & SUTTER, PLLC**
**P.O. Box 26321**
**310 Natural Resources Drive**
**Little Rock, Arkansas 72221-6321**
**(501) 224-1050**
**FAX:  (501) 223-9136**


_Michelle Kaemmerling_
Michelle M. Kaemmerling
Attorneys for Defendant